UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Nº 11-CR-717 (JFB)
_____

UNITED STATES OF AMERICA,

versus

JUVENILE MALE,

Defendant.
_____

MEMORANDUM AND ORDER
February 24, 2012
_____

JOSEPH F. BIANCO, District Judge:

On October 20, 2011, the government filed a Juvenile Information ("Information") against defendant Juvenile Male ("the defendant") charging him with one count of conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5); one count of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1); one count of brandishing and discharging a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii) and (iii); and one count of causing the death of another through the use of a firearm, 18 U.S.C. § 924(j)(1). The government subsequently moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On February 6, 2012, after written submissions had been filed with the Court, the Court conducted an evidentiary hearing on the government's transfer motion.[1] This Memorandum and Order contains the Court's findings pursuant to 18 U.S.C. § 5032.

For the reasons set forth herein, the Court finds that transfer of this case to district court for prosecution of the defendant as an adult is warranted in the interest of justice. More specifically, as discussed in great detail below, after conducting a hearing and carefully analyzing the statutory factors, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted.

---

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. *See* 18 U.S.C. § 5038(e). The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Juvenile Information should be sealed.

Applying the statutory factors, it is clear that this is a compelling case for transfer to adult status. First, the nature of the alleged offense – the murder of a fifteen-year-old at a crowded house party using a rifle with a scope – overwhelmingly favors, in the interest of justice, transferring the case to district court so that the defendant can be prosecuted as an adult. Moreover, this murder is alleged to have been committed as part of the defendant's participation in the racketeering activity of the violent La Mara Salvatrucha ("MS-13") street gang. Thus, the Court finds that the nature of the alleged offense is entitled to special weight in this case. The juvenile justice system, including the limited sentencing options available in that system if the defendant is found guilty (such as the statutory maximum of five years' incarceration), is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, these grave charges when considered in conjunction with the other statutory factors. Second, with respect to the statutory factor regarding the age and social background of the defendant, he allegedly committed the offense when he was sixteen years and three months old, and he is now eighteen years old. The defendant grew up in a stable, loving family, yet still turned to gang activity, based upon his prior record and as alleged in the Juvenile Information. Although defendant's age at the time of the alleged crime weighs against transfer, his current age and family background tip this factor slightly in favor of transfer. Third, the defendant's prior juvenile record, which includes several periods of time in juvenile detention centers, repeated probation violations, and adjudications for menacing and assault, strongly favors transfer. In fact, the defendant is alleged to have participated in the murder only eleven days after the defendant's release on bail from the Nassau County Juvenile Detention Facility. The fourth factor, the defendant's present intellectual development and psychological maturity, is a neutral factor in determining whether to transfer the defendant to adult status. Specifically, although Dr. Sanford L. Drob ("Dr. Drob"), the psychologist who examined the defendant for the defense, determined that the defendant is socially, interpersonally, and emotionally immature, he also concluded that the defendant is of average intelligence with reasonably strong verbal and non-verbal reasoning abilities. (November 21, 2011 Report of Dr. Sanford L. Drob ("Drob") at 9-10.) Thus, this factor neither weighs against nor in favor of transfer. Fifth, the factor regarding past treatment efforts supports transfer because the defendant's lengthy history of recidivism undermines Dr. Drob's findings that the defendant has a good chance of achieving rehabilitative goals, and demonstrates that the defendant has not responded positively to past treatment. Finally, although the sixth factor weighs against transfer given the apparent availability of out-of-state juvenile facilities that would have programs designed to treat the defendant's behavioral problems, this factor does not outweigh the other factors. In particular, the serious and violent nature of the offense and the defendant's extensive criminal history and recidivism in the face of rehabilitative efforts overwhelmingly favor transfer. In short, after considering and weighing all of the statutory factors, as discussed in detail below, the Court has determined that the interest of justice would be served by treating the defendant as an adult in this case.

2

I. THE CHARGES[2]

The charges against the defendant stem from his alleged involvement in MS-13, a criminal enterprise based in El Salvador and operating in Long Island, Queens, and elsewhere in the United States and Central America. (Gov't Mem. of Law at 2-3.) On Long Island, MS-13 is alleged to have engaged in street wars with rival gangs that have resulted in the murder, shooting, and assault of MS-13 and rival gang members, as well as their families and innocent bystanders. (*Id.* at 2-3.) Twenty-five defendants allegedly associated with MS-13 have been charged with various crimes in a 70-count superseding indictment filed on March 3, 2011 in *United States v. Prado*, No. 10-CR-074 (JFB).

As set forth in the government's transfer motion, the defendant has been charged in connection with the murder of fifteen-year-old "C.H." According to the allegations in the government's submissions, on November 20, 2009, several members of the MS-13, including co-conspirator #1 ("CC-1"), co-conspirator #2 ("CC-2"), co-conspirator #3 ("CC-3"), and co-conspirator #4 ("CC-4") (collectively, "co-conspirators") held a meeting in which they discussed carrying out an attack against rival gang members. (*Id.* at 5.) The defendant, who at the time was not yet a member of MS-13, but was an associate seeking admission to the gang, was present at the meeting.[3] (*Id.* at 6.) During the meeting, the defendant and his co-conspirators agreed that they would attack a house in Brentwood, New York where they believed rival gang members would be attending a house party. (*Id.* at 6.) The defendant agreed to be one of the shooters in a murder at the Brentwood house. (*Id.*) After the meeting, the co-conspirators provided defendant with a .22 caliber rifle outfitted with a scope, and provided CC-3 with a .25 caliber semi-automatic handgun. (*Id.*) The weapons belonged to the Brentwood Locos Salvatruchas ("BLS") clique of the MS-13. (*Id.*)

After acquiring the weapons, the defendant and CC-3 got into a car, which CC-4 was driving. (*Id.*) CC-1 and CC-2 got in to a second car and conducted surveillance of the Brentwood house to ensure that there were no police officers present. (*Id.*) CC-4 parked the car next to the target location, and the defendant and CC-3 exited the car, armed with the .22 caliber rifle and the .25 caliber handgun, respectively. (*Id.*) The defendant and CC-3 approached the Brentwood house and waited several minutes until a crowd of people had

---

[2] The allegations set forth herein were drawn from the government's motion papers and supporting documentation, including the Juvenile Information. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offense as they are alleged by the government and takes no position as to the relative strength of the evidence supporting those allegations.

[3] The defendant allegedly participated in C.H.'s murder in part to gain the status necessary to become a full-fledged member of the MS-13. (Gov't Mem. of Law at 6 n.1) Indeed, after C.H.'s murder, the defendant was "jumped into" – *i.e.*, became a member of – the Brentwood Locos Salvatruchas clique of the MS-13. As set forth in the government's transfer motion, when MS-13 members are inducted into the gang, they agree to kill "chavalas" – members of rival gangs – whenever possible. (*Id.* at 4.)

3

gathered outside. (*Id.* at 6-7.) The defendant then fired multiple shots with the rifle, one of which struck C.H. in the head, killing him. (*Id.* at 7.) CC-3 attempted to fire the .25 caliber handgun, but the weapon misfired. (*Id.*) The defendant and CC-3 ran back to the car and were driven away by CC-4. (*Id.*) CC-3, CC-4, and the defendant met back up at another co-conspirator's house, where they were congratulated on a successful mission by CC-1 and CC-2. (*Id.*) The defendant and CC-3 then returned the guns to the BLS clique. (*Id.*)

In January 2010, CC-3 and CC-4 were arrested in connection with a drive-by shooting. (*Id.*) Law enforcement officers recovered a .22 caliber rifle with a scope during that arrest. (*Id.*) Ballistics tests confirmed that it was the weapon used to murder C.H. (*Id.*) On September 16, 2011, the FBI's Long Island Gang Task Force arrested defendant. (*Id.*)

## II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032).[4] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. *See* 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption that exists in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. *See Nelson I*, 68 F.3d at 588; *United States v. John Doe #3*, 113 F. Supp. 2d 604, 605 (S.D.N.Y. 2000).

Although the Court must evaluate each of the six factors outlined in § 5032, it need not afford each of these factors equal weight, and instead "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true

---

[4] In addition, § 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the United States Attorney for the Eastern District of New York, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial federal interest in the case and the offenses to warrant the exercise of federal jurisdiction." (Gov't Mem. of Law, Ex. 3.)

4

when the case involves "[t]he heinous nature of the crime of intentional murder," which "certainly may be a factor entitled to special weight." *Id.* Furthermore, the defendant's potential for rehabilitation typically should also be given "special emphasis." *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002). Indeed, the notion of rehabilitation "permeat[es] the transfer decision . . . [and] clearly is one of the primary purposes of the juvenile delinquency provisions." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*") (internal quotation marks and citation omitted). Nevertheless, even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," this factor "must be balanced against the threat to society posed by juvenile crime." *Id.* (internal quotation marks and citations omitted). Accordingly, it is not sufficient for a court to find that there is merely a "glimmer of hope" for a juvenile's future treatment prospects. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance [between] . . . . affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*, 90 F.3d at 640 (citations and alterations omitted).[5]

### III. ANALYSIS OF FACTORS

### A. Juvenile's Age and Social Background

The Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that district court erred in refusing to consider juvenile's age at the time of the transfer hearing and noting that "unless the government intentionally delays the filing of juvenile charges, there is every reason to give weight also to the age at the time of the transfer motion. The statutory factor specifies only 'age,' and certainly, current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application."). The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer. *See United States v. Juvenile Male*, 554 F.3d 456, 468-69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports

---

[5] Section 5032 of the Juvenile Justice and Delinquency Prevention Act also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male #1*, 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard outlined *supra*.

5

his transfer."); *Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citation omitted)).

In this case, the defendant was 16 years, 3 months old at the time of the alleged murder and 18 years, 5 months old at the time of the hearing. The defendant's age at the time of the crime weighs against transfer. *See United States v. Juvenile Male N.R.*, 24 Fed. App'x 638, 639-40 (8th Cir. 2001) (defendant's age of 16 at the time of the crime, along with his social background, weighed against transfer); *United States v. Anthony Y.*, 990 F. Supp. 1310, 1313 (D.N.M. 1998) (defendant's age of 16 and 2 months at the time of crime "favor[ed] retaining juvenile status"); *United States v. Nelson*, 921 F. Supp. 105, 114-115 (E.D.N.Y. 1996), *aff'd* 90 F.3d 636 (2d Cir. 1996) (defendant's age of 16 at the time of the crime, along with his potential receptivity to treatment and rehabilitation and his lack of criminal history, weighed against transfer). The defendant's current age, however, weighs in favor of transfer. Insofar as rehabilitation is one of the primary focuses of a district court in determining whether to transfer a defendant to adult status, the Court finds that the defendant's current age of 18 years and 5 months, which would allow him only five years[6] in a juvenile detention facility to rehabilitate himself, weighs in favor of transfer. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *Juvenile Male*, 554 F.3d at 468-69 ("In analyzing the first factor . . . . we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21.").

The Court finds that the defendant's social background also weighs in favor of transfer. The defendant was born in the United States. His parents are both from El Salvador. (Drob at 1.) Although they are not married, they have been in a long-term relationship, and were both involved in his upbringing. (*Id.*) The defendant told Dr. Drob that he was treated well as a child and felt loved by both of his parents, though he felt closer to his mother because his father "works a great deal and is very distant." (*Id.*) The defendant's parents occasionally fight, particularly when his mother accuses his father of cheating on her. (*Id.* at 2.) The defendant denies any history of physical or sexual abuse. (*Id.*) The family, which also includes defendant's three siblings, resides on Long Island. (*Id.* at 1.) The defendant

---

[6] *See* 18 U.S.C. § 5037(c)(2)(A)(i)-(ii) ("The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may not extend . . . in the case of a juvenile who is between eighteen and twenty-one years old (A) who if convicted as an adult would be convicted of a Class A, B, or C felony, beyond the lesser of (i) five years or (ii) the maximum of the guideline range . . . applicable to an otherwise similarly situated adult defendant . . . .")

6

told Dr. Drob that his family has always been reasonably well-off, and in fact owns the home the defendant was raised in. (*Id.* at 2.)

The defendant's mother made efforts to stop her son from engaging in criminal activity. In October 2008, for example, she gave a sworn statement that her son was violating his curfew and that she believed he was smoking marijuana. She said she "would rather see him in placement than be in danger running the streets." (Gov't Ex.[7] 5.) In December 2008, defendant's mother provided another sworn statement that her son was disobeying his curfew, returning home between 11 p.m. and 2 a.m. each night. (*Id.*) Defendant's mother further stated that she suspected from her son's red eyes and frequent laugher that he was using marijuana. (*Id.*) The defendant told Dr. Drob that his mother had told the defendant's probation officer that her son was in violation of probation when he was 15 because "she saw that the defendant was hanging out with the wrong people." (Drob at 3.)

The defendant received his GED in Suffolk County Correctional Facility in July 2011. (*Id.* at 2.) He attended high school until the 11th grade prior to his arrest. (*Id.*) His school records reveal that he had very strong grades (80s and 90s) in the 9th Grade, with "some deterioration" in the 10th and 11th grades. (*Id.*) The defendant explained to Dr. Drob that he had hoped to obtain a Regents Diploma, as he needed to pass only two more Regents exams prior to his arrest. (*Id.*) The defendant's mother told Dr. Drob's wife and associate, Liliana Rusansky-Drob, a Spanish-speaking New York State licensed psychologist, that "her son's school regarded him as quite intelligent and his grades were good." (*Id.* at 6.) At some point, however, defendant was home-schooled because of his poor attendance and behavior in school. (*Id.* at 2.) As to substance abuse, the defendant denied drinking alcohol, but reported that he used to smoke approximately two marijuana "blunts" per day. He told Dr. Drob that he had given up marijuana while on probation. (*Id.* at 3.)

Accordingly, despite the defendant's stable, loving home life and his mother's efforts to prevent him from engaging in criminal activity, the defendant nevertheless allegedly chose to join a gang. *See United States v. H.V.T.*, 96-CR-244 (RSP/GJD), 1997 U.S. Dist. LEXIS 15220, at *11 (N.D.N.Y Oct. 1, 1997) ("It appears that H.V.T. had a family structure available to him in his older brothers and aunts and uncles in the United States. Instead of taking advantage of the support that structure offered, H.V.T. quit school and left home. . . . It also appears that H.V.T. became a member of a gang.") Although defendant indicated to Dr. Drob that he would like to remove himself from past gang associations, take college courses, and develop a career, the Court finds that the defendant's background indicates that it is highly unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged.

In sum, the defendant's age of 16 at the time of the crime weighs against transfer, but the defendant's current age and social background weigh in favor of transfer. Accordingly, this factor weighs slightly in

---

[7] "Gov't Ex." refers to the government's exhibits that were admitted into evidence at the February 6, 2012 transfer hearing.

7

favor of transfer.[8] *See, e.g.*, *United States v. Juvenile (I.H., Jr.)*, 1 F. Supp. 2d 509, 518 (D.V.I. 1998) ("I.H.'s age at the time of the offenses [16 at time of carjacking and rape; 17 at time of robbery] and at the time of transfer [19] auger in favor of transferring him for prosecution as an adult. It must also be considered that his having come from a stable home and yet having done these terrible acts likewise weigh in favor of transfer.").

### B. Nature of the Offense Alleged

As an initial matter, as noted *supra*, a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States v. Doe #1*, 74 F. Supp. 2d 310, 317 n.6 (S.D.N.Y. 1999) ("For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment."). There is no question that the offense charged in the Information is serious and extremely violent. The defendant and his co-conspirators are alleged to have murdered a fifteen-year-old at a house party in furtherance of the MS-13's bloody gang feuds with rival gangs. They allegedly waited until a crowd had gathered outside of house party before the defendant fired the fatal shot at C.H. and fired additional shots in the area in the hopes of killing "chavalas" – members of rival gangs. Defendant allegedly used a rifle with a scope, which enabled him to aim at C.H.'s head. He allegedly committed the murder in order to demonstrate that he was violent enough to gain full membership in the MS-13 gang. As the Second Circuit has noted, "[t]he heinous nature of the crime of intentional murder certainly may be a factor entitled to special weight." *Nelson I*, 68 F.3d at 590. Moreover, these murders were allegedly committed as an integral part of the defendant's participation in the violent racketeering activity of the MS-13 gang.

The Court finds not only that this factor weighs overwhelmingly in favor of transfer, but also that this factor should be afforded more weight than any of the other factors. *See id.* ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors.") An intentional murder such as the crime alleged here constitutes the type of "particularly serious" crime that warrants weighing the nature of the offense more heavily than any of the other factors in the transfer analysis. Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious – or even, in some cases, less serious – than the crimes alleged here. *See United States v. One Juvenile Male*, 40 F.3d 841, 846 (6th Cir. 1994) (district court did not abuse discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a car's passenger, "outweighed any factors that supported trying the defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six

---

[8] Even assuming *arguendo* that this factor weighed against transfer, the Court would still conclude that transfer is warranted based upon a balancing of the other factors, for the other reasons set forth herein. *See e.g.*, *United States v. Jerry Paul C.*, 929 F. Supp. 1406, 1408 (D.N.M. 1996) (transferring defendant to adult status where his age of 15 weighed against transfer, but other factors "tilt[ed] in favor of transfer").

statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *Doe #1*, 74 F. Supp. 2d at 321 (although majority of factors weighed against transfer, transfer nonetheless was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior"); *In re J. Anthony G.*, 690 F. Supp. at 766 ("While all of the factors weigh very heavily, I feel that the seriousness of this offense is perhaps the most critical factor in this case. While his family seems very supportive of him, Anthony has chosen to break away from his family and lead a life that is completely unknown to them. Except for the fortuity of one of the four bullets striking the metal frame of the window, Anthony would have been accused not only of attempted robbery, but of murder.").[9]

---

[9] The Court notes that there are juvenile transfer cases in which the defendant allegedly committed murder, but was not transferred to adult status. *See United States v. A.F.F.*, 144 F. Supp. 2d 797 (E.D. Mich. 2001); *United States*

## C. Nature and Extent of Any Prior Delinquency Record[10]

---

*v. Leon D.M.*, 953 F. Supp. 346 (D.N.M. 1996); *United States v. C.J.T.G.*, 913 F. Supp. 63 (D.P.R. 1994); *United States v. M.L.*, 811 F. Supp. 491 (C.D. Cal. 1992)).) As an initial matter, the Court notes that each of these cases are factually distinguishable from the defendant's case. For example, in *Leon D.M.*, *C.J.T.G.*, and *M.L.*, the defendants had not received any prior treatment and had either no, or very minor, delinquency records. Likewise, the nature of the offense in *A.F.F.* is distinguishable from the offense alleged here – although both *A.F.F.* and the defendant here were charged with murder, the murder alleged in *A.F.F.* had no ties to any organized gang activity and instead was related to a child abuse incident that "was not motivated by personal gain, greed or avarice, but rather resulted from an apparent psychological reaction to circumstances with which the defendant could not cope." *A.F.F.*, 144 F. Supp. 2d at 803. The decision whether to transfer a juvenile to adult status is a fact-specific inquiry that is left to the sound discretion of the district court and is based upon a number of statutory factors and considerations, as discussed herein. Accordingly, the Court finds these cases to be unpersuasive and finds, for the reasons discussed *supra*, that when the nature of the offense is analyzed and balanced in conjunction with the other statutory factors under the particular circumstances of *this* case, transfer to adult status is clearly warranted.

[10] Although the Second Circuit has never addressed the issue, there is a circuit split regarding whether this factor should encompass both arrests and convictions, *see United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998), or whether it should apply only to convictions, *see United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Tenth Circuit has acknowledged the split but has declined to reach the issue, finding instead that even if this factor were limited to prior convictions, a juvenile's additional conduct would be relevant to other

The defendant's criminal history dates back to March 7, 2006, when he was arrested at the age of 12 for unlawful possession of a weapon by a person under 16. (Gov't Mem. of Law, at 8.) On January 10, 2007, he was adjudicated a juvenile delinquent and placed on probation for two years. (*Id.*) Defendant violated probation soon thereafter for, among other things, truancy and fighting in school, and he was placed in a custodial juvenile facility from approximately September 4, 2007 to March 12, 2008. (*Id.*) Prior to entering the facility, on August 14, 2007, defendant was arrested and charged in Suffolk County with menacing. (*Id.*) He was re-adjudicated a juvenile delinquent as a result of the menacing charge and placed on probation for one year, which included reporting daily to the Juvenile Day Reporting System. (*Id.*) On September 22, 2008, defendant again violated probation by breaking curfew, and he was returned to a juvenile custodial facility for eight months. (*Id.*) On November 26, 2008, representatives from the Suffolk County Probation Department visited the defendant at the facility and watched him during a group counseling session. (*Id.*) Defendant was the only individual at the session who was wearing MS-13 gang colors, and was the only individual, when asked, who believed he was going to go to jail after he was released from the facility. (*Id.* at 8-9) Defendant was released on December 18, 2008. (*Id.* at 9.)

On July 22, 2009, at the age of 15, defendant was arrested again and charged with assault in the first degree with a weapon and gang assault. (*Id.*) He was sent to Nassau County Juvenile Detention Facility, where he remained until November 9, 2009, when he was released on bail. (*Id.*) Eleven days later, on November 20, 2009, he allegedly participated in C.H.'s murder.

On January 4, 2010, the defendant was adjudicated and sentenced as a youthful offender on the pre-existing assault charges from July 2009, and received a sentence of six months' incarceration and five years' probation. (*Id.*) During the assault, defendant, acting in concert with others, caused substantial and probably permanent injuries to the victim. (*Id.*) In his presentence interview, defendant told

---

factors in the transfer analysis. *See United States v. Anthony Y.*, 172 F.3d 1249, 1253-54 (10th Cir. 1999), *cert. denied* 528 U.S. 897 (1999) ("Even if we limited Anthony Y.'s prior delinquency to the three adjudicated offenses, the additional conduct considered by the district court was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts.' [T]he plain language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise, the juvenile has taken, as long as it is relevant." (additional quotation marks and internal citations omitted)); *cf. A.R.*, 203 F.3d 955, 962 n.2 (6th Cir. 2000) (citing *Anthony Y.* and noting "[w]e need not resolve this question since the district court did not place greater weight on this factor relative to others"); *Doe #1*, 74 F. Supp. 2d at 316 n.5 (noting split and stating that "the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the 'prior juvenile record' factor") (citation omitted). *But see In re Sealed Case*, 893 F.2d 363, 369 n.12 (D.C. Cir. 1990) (stating that a "juvenile's alleged violations of law" are "entirely unrelated" to other factors in the transfer analysis). In any event, this Court need not resolve this question because the Court has considered only the offenses of which the defendant was adjudicated guilty, and not the offenses for which the defendant was arrested. The Court is not considering any conduct that related solely to an arrest.

Suffolk County Probation Officers that, while he was not a member, he "hung out" with MS-13 gang members. (*Id.*) The probation officers noted that defendant exhibited no remorse "whatsoever" for his actions and claimed that the victim was a rival gang member. (*Id.*)

While on probation for the assault, defendant tested positive four times for marijuana use, refused to engage in inpatient drug treatment as directed by the probation department, was arrested on three occasions, and was expelled from school for writing MS-13 gang graffiti on school property. (*Id.* at 10.) The three arrests included: (1) A January 21, 2010 arrest, with other MS-13 members, for criminal possession of marijuana in the fifth degree and criminal possession of a weapon in the fourth degree. The defendant ultimately pleaded guilty to the criminal violation of disorderly conduct and paid a fine. (*Id.*) (2) A September 13, 2010 arrest, with other MS-13 members, for criminal mischief, criminal trespass, and resisting arrest. The defendant pleaded guilty to resisting arrest and received a 90-day sentence. (*Id.* at 10-11.) (3) A May 29, 2011 arrest for the Class B misdemeanor offense of criminal possession of marijuana in the fifth degree, for which the defendant pleaded guilty and paid a fine. (*Id.* at 11.) On September 16, 2011, defendant was found to be in violation of probation as a result of the totality of his conduct, and was sentenced to one year of incarceration. (*Id.*)

This record demonstrates that the defendant has been in and out of juvenile detention facilities since the age of 12. The defendant has also engaged in increasingly serious crimes, moving from menacing to assault and is now alleged to have participated in a murder as part of MS-13 gang activity. Given his prior record of recidivism, the Court finds that this factor weighs strongly in favor of transfer. *See United States v. Juvenile Male #2*, 761 F. Supp. 2d 27, 40 (E.D.N.Y. 2011) ("As this record indicates, for the past several years, the defendant has been in-and-out of juvenile detention facilities and has continued to engage in criminal activity that was tied, at least in part, to his membership in MS-13. Moreover, although the defendant pled guilty only to misdemeanors, the record indicates that both convictions stemmed from serious conduct, including possession of a two-foot long machete. . . . Given the defendant's prior record of recidivism, the Court finds that this factor strongly weighs in favor of transfer."); *Doe #1*, 74 F. Supp. 2d at 321 ("[T]he court is particularly concerned with the seriousness of the crimes alleged, and the recidivist behavior exhibited by defendant. . . . Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior.").

### D. Juvenile's Present Psychological Maturity and Intellectual Development

Defendant underwent a forensic psychological examination conducted by Dr. Drob, a clinical and forensic psychologist who prepared an evaluation of the defendant for the defense. Dr. Drob examined the defendant on November 18, 2011, and prepared a report three days later. During the examination, Dr. Drob conducted a mental status exam and administered several psychological tests, including the Wechsler Adult Intelligence Scale – 4th Edition ("WAIS-IV"), the Millon Adolescent Clinical Inventory test ("MACI"), and the Rorschach Inkblot Method ("RIM"). (Drob at 7.)

As to the defendant's intellectual development, his scaled IQ score of 97 on the WAIS-IV placed him in the 42nd percentile in comparison to individuals in

11

his age range and was "indicative of intellectual functioning the average range." (*Id.*) Dr. Drob noted that all four major WAIS-IV Index scores were close to the average range (90-110). (*Id.*) The lowest scores were on subtests involving vocabulary (9th percentile) and fund of information (16th percentile), but Dr. Drob explained that these "comparatively low scores likely reflect cultural factors and the defendant's limited education." (*Id.*) The defendant scored in the 61st percentile on a test of verbal reasoning. His "strong verbal reasoning skills suggest that he has the capacity to continue his education and succeed in college." (*Id.*) Dr. Drob concluded that the defendant was a person of "at least average intellectual potential whose cognitive strengths lie in the area of both verbal and non-verbal reasoning, processing speed and constructional skills," but who exhibited "a marked weakness in his "vocabulary and fund of information," likely incident to his early exit from school. (*Id.* at 9.) Dr. Drob noted that the defendant's "[t]hinking was logical, goal directed and coherent and responses were appropriate to the context." (*Id.* at 5.) During the examination, the defendant's "[e]xpressive and receptive language skills were adequate with verbal spontaneity, productivity, grammar, enunciation, and comprehension of speech all appropriate for [the defendant's] level of education." (*Id.*)

Regarding the defendant's psychological maturity, Dr. Drob concluded that psychological assessment revealed that the defendant is "socially, interpersonally and emotionally immature." (*Id.* at 10.) The defendant has "limited psychological insight into his motives and behaviors and suffers from low self-esteem." (*Id.*) Additionally, he can be "socially insecure, non-assertive, and self-effacing" and is "intent upon obtaining the approval" of others, even "if this involves engaging in self-defeating and at times aggressive behavior." (*Id.*) Dr. Drob further emphasized the defendant's need for approval, noting that he is someone "for whom the criticism of others, such as parents and teachers cause him considerable pain and humiliation." (*Id.* at 8.) The defendant's test results "suggest he feels lonely, socially isolated and unliked by peers. He fears independence and his helpless and other immature behaviors reinforce a self-image of being ineffectual, and prevent him engaging in activities that would foster his maturation." (*Id.*) Dr. Drob observed "indications that [the defendant] has limited psychological insight" but observed no signs of "psychosis or a thinking disorder." (*Id.* at 8, 9.)

From the RIM test, Dr. Drob determined that the defendant has "limited coping skills and is unlikely to manage even day to day stresses without becoming unduly distressed. This places him at recurrent risk for episodes of anxiety, depression, irritability and poor impulse control. He will typically do reasonably well in highly structured situations, but will falter when left to his own devices." (*Id.* at 8.)

Based on this record, the Court finds that this factor is neutral, neither weighing in favor of, nor against, transfer. On the one hand, Dr. Drob determined that the defendant is "socially, interpersonally and emotionally immature." (*Id.* at 10.) The defendant is insecure and intent upon obtaining the approval of others. His immaturity is reinforced by his "self-image of being ineffectual," which "prevent[s] him [from] engaging in activities that would foster his maturation." (*Id.* at 8.) On the other hand, the defendant's intellectual development is at least average. His "cognitive strengths lie in the area of both verbal and non-verbal reasoning, processing

speed and constructional skills." (*Id.* at 9.) The areas in which defendant showed weakness – "vocabulary and fund of information" – were likely due to his early exit from school. (*Id.*) Moreover, the defendant's "[t]hinking was logical, goal directed and coherent and responses were appropriate to the context." (*Id.* at 5.) Defendant's ability to earn his GED while in prison and his strong grades early in high school bolster these findings. (*See id.* at 2.)

Thus, although defendant's immaturity weighs against transfer, the defendant's average intelligence, strong verbal reasoning skills, and logical and coherent responses weigh in favor of transfer. The Court finds, therefore, that this factor is neutral.[11] *See, e.g.*, *United States v. Dion L.*, 19 F. Supp. 2d 1224, 1226 (D.N.M. 1998) (transferring to adult status defendant who was "at least of average intelligence," but "psychologically immature and something of a follower," where other factors weighed in favor of transfer).

E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

The defendant participated in counseling during his incarceration at Nassau County Juvenile Detention Center. (*See, e.g.*, Gov't Ex. 6.) Medical records from the facility indicate that the defendant met with a psychiatrist on multiple occasions from at least July 23, 2009 through October 26, 2009. (*See* Gov't Ex. 6.) Defendant also participated in group counseling. On one occasion, representatives from the Suffolk County Probation Department visited him at the juvenile facility and observed him at a group counseling session. They noted that the defendant was the only individual at the session wearing gang colors. (Gov't Mem. of Law at 8.)

In his report, Dr. Drob notes that the defendant "appears to have a strong conscience and to be distressed by his past delinquent tendencies." (Drob at 8.) At the same time, Dr. Drob commented that it was "unclear to what degree his conforming, accommodating and overly respectful presentation is an attempt to avoid or mitigate the legal difficulties he has now encountered." (*Id.*) Dr. Drob concluded that the defendant, because of his "receptivity to the influence of others," could be "receptive to the positive influence of an adult role model or therapist." (*Id.*) Dr. Drob further noted that the defendant "indicates that he would like to remove himself from his past gang associations, take college courses, and develop an occupation or career. Given his intelligence, interpersonal receptivity and capacity to conform to influence, he has a good chance of achieving such rehabilitative goals in a highly controlled, positive environment." (*Id.* at 10.)

---

[11] Even assuming *arguendo* that this factor weighed against transfer, the Court would still conclude that transfer is warranted based upon a balancing of the other factors, for the other reasons set forth herein. *See, e.g.*, *A.R.*, 203 F.3d at 962 ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law."); *Doe #3*, 113 F. Supp. 2d at 609 (granting transfer motion even where defendant's social background, his present intellectual development, and the availability of treatment programs weighed against transfer, and defendant's psychological maturity was a neutral factor); *Doe #1*, 74 F. Supp. 2d at 320-21 (transferring case even though defendant's social background, his present intellectual development and psychological maturity, his response to past treatment efforts, and the availability of treatment programs all weighed against transfer).

13

Nevertheless, the Court finds that this factor weighs in favor of transfer. It is clear from the defendant's criminal history that the treatment efforts made at Nassau County Juvenile Detention Center had no impact on his recidivist tendencies. To the contrary, the defendant was arrested and charged with assault in the first degree with a weapon and gang assault in the first degree seven months after his release from Nassau County Juvenile Detention Center and is now alleged to have been involved in the murder of C.H. only eleven days after his final release from Nassau County Juvenile Detention Center. *See Doe #1*, 74 F. Supp. 2d at 321 ("Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior. . . . As rehabilitation is the primary purpose of the federal delinquency provisions, including § 5032, and the government has demonstrated by a preponderance of the evidence that rehabilitation is not likely in this case, the court finds that transfer of John Doe to adult status is warranted."). The defendant's recidivism in spite of his participation in treatment programs undermines Dr. Drob's conclusions that the defendant would be receptive to such treatment. Defendant's actions strongly suggest not only that the defendant did not respond well to prior treatment efforts, but also that it is likely that any efforts to rehabilitate the defendant at this point would be futile. Accordingly, the Court concludes that this factor weighs heavily in favor of transfer.

F. Available Programs That Are Designed to Treat the Juvenile's Behavior Problems

The government asserted that, according to the Northeast Regional Office of the Bureau of Prisons, there are no federal facilities for individuals adjudicated as juvenile delinquents. (Gov't Mem. of Law at 21.) Instead, such individuals from this district would be sent to state contract facilities for juveniles in either Pennsylvania or Maine. (*Id.*) No such facilities would be available in New York State for individuals of the defendant's age. (*Id.*) The government further noted that, although defendant is currently being held in the Youthful Offender wing of the Essex, New Jersey Detention Facility, the defendant is already eligible to be incarcerated in an adult facility since he is over 18 years old. (*Id.*)

The Court finds that the government has failed to meet its burden on this factor. As noted by the Second Circuit, the government must "do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is at least some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant. Thus, the Court finds that this factor weighs against transfer, but does not outweigh the other factors which, in combination, overwhelmingly favor transfer. *See Doe #3*, 113 F. Supp. 2d at 609 (finding factor weighed against transfer where "the government did no more than merely assert the unavailability of an appropriate juvenile rehabilitative program for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (internal quotation marks, alterations, and citation omitted)).

\*   \*   \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of

justice. As an initial matter, the defendant is charged with the murder of a fifteen-year old in connection with MS-13 gang activity. This serious and violent type of crime strongly weighs in favor of transfer. Moreover, a review of the factors demonstrates that the defendant is not likely to respond to rehabilitative efforts. For example, as described in detail *supra*, the defendant failed to respond to prior rehabilitative efforts. Indeed, as indicated by the defendant's criminal history, he repeatedly failed to take advantage of lenient sentences that he received and instead continued to reoffend. Furthermore, the fact that the defendant is already 18 years old, considered in conjunction with the other factors, also strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *J. Anthony G.*, 690 F. Supp. at 766 ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). The Court finds, therefore, that the defendant's rehabilitation potential is low.

The Second Circuit has made clear that "while rehabilitation is a priority, the courts are not required to apply the juvenile justice system to a juvenile's diagnosed intellectual or behavioral problems when it would likely prove to be anything more than a futile gesture." *Nelson I*, 68 F.3d at 590 (internal quotation marks and citation omitted). In addition, "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *Nelson II*, 90 F.3d at 640 (internal quotation marks and citation omitted). Accordingly, given that the crimes charged here involve the "heinous . . . crime of intentional murder," *Nelson I*, 68 F.3d at 590, and given that the record demonstrates that the defendant is unlikely to be rehabilitated, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.

### IV. CONCLUSION

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 24, 2012
       Central Islip, New York

\*       \*       \*

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722 by John J. Durham, Assistant U.S. Attorney. Defendant Juvenile Male is represented by Stuart J. Grossman**,** Grossman & Rinaldo, 108-18 Queens Boulevard, Forest Hills, New York 11375.